***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before Deputy Commissioner Holmes as:
 STIPULATIONS
1. The parties entered into a pre-trial agreement on February 18, 2002, which was incorporated into the record.
2. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
3. On January 25, 2000, the date of injury, this case was subject to the North Carolina Workers' Compensation Act.
4. An employment relationship existed between plaintiff and defendant-employer at all relevant times.
5. Defendant-employer was self-insured and the third party administrator was Cameron M. Harris Co.
6. Plaintiff's injury on January 25, 2000 was a contusion of the coccyx, which resulted in low back pain and numbness in the right thigh.
7. Plaintiff's average weekly wage at the time of the injury was $613.80 which yields a compensation rate of $409.22 per week.
8. The issue before the Commission is to what benefits and compensation, if any, is plaintiff entitled.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before Deputy Commissioner Holmes, plaintiff was 51 years of age. Plaintiff began working at ACME Spinning in 1979. Her first job with defendants was as a spinner and she later worked as a spare hand. ACME Spinning was purchased by Parkdale in the early 1980s. Plaintiff then moved to the position of shipper and was working on January 25, 2000 as a shipper. Her job duties as a shipper included driving a forklift, loading and unloading trucks and performing paperwork in regard to the bills.
2. Plaintiff had a preexisting hiatal hernia, a previous carpal tunnel surgery and had undergone gall bladder surgery, a tubal ligation, and the repair of a hole in her stomach. None of these conditions relate to plaintiff's injury by accident on January 25, 2000.
3. On January 25, 2000, plaintiff was injured at approximately 7:15 a.m. after arriving at work. As she was walking across the company parking lot in icy conditions, she slipped on ice and fell.
4. Defendants filed a Form 60, "Employer's Admission of Employee's Right to Compensation," with the North Carolina Industrial Commission dated April 12, 2000. On the Form 60, defendants admitted plaintiff's right to compensation for the injury to her tailbone.
5. Thereafter, a Form 28 "Return to Work Report" dated May 3, 2000 was filed with the Industrial Commission after plaintiff returned to work. The report indicated that plaintiff's disability began on March 8, 2000 and that she returned to work on March 27, 2000.
6. Dr. Joseph P. Zuhosky was plaintiff's primary treating physician and practices with the Miller Orthopaedic Clinic in Huntersville, North Carolina. Dr. Zuhosky diagnosed plaintiff with a transitional spine anatomy with a bilateral L-4 pars defect as well as L4-L5 spondylolisthesis. Dr. Zuhosky felt that these conditions were preexisting and they were not caused or aggravated by the injury by accident. The x-rays of plaintiff's spine showed that at the L5-S1 vertebra, there was less of a disc present. The L4-L5 spondylolisthesis actually represented a slippage of one vertebra on another. Dr. Zuhosky testified that it is "almost certain" that the spondylolisthesis was preexisting prior to the January 25, 2000, incident. In addition, Dr. Zuhosky explained that given the absence of any increased uptake in her bone scan at that level, "the fall would almost certainly not have accelerated her spondylolisthesis or that would have been evident on her bone scan."
7. Dr. Zuhosky noted that a May 15, 2000 CT scan of plaintiff's lower back indicated increased uptake at the SI joint, which showed that there was increased blood flow to the area. Dr. Zuhosky obtained an additional CT scan to determine whether there was a fracture. The second CT scan revealed no evidence of a clear fracture but Dr. Zuhosky felt that plaintiff's nerve conduction test showed plaintiff suffered ulner neuropathy of her elbow.
8. On March 24, 2000, Dr. Zuhosky allowed plaintiff to return to light duty work with work restrictions of no lifting more than twenty-five pounds, no pushing or pulling more than fifty pounds, no bending, stooping or kneeling and no forklift driving. As indicated on the Form 28, plaintiff returned to work on March 27, 2000.
9. On October 16, 2000, Dr. Zuhosky determined that plaintiff was at maximum medical improvement and assigned a permanent partial disability rating of 3% to her spine based on the North Carolina Industrial Commission guidelines. On October 16, 2000, Dr. Zuhosky released plaintiff to full duty work without any permanent restrictions with respect to her spine. At the time of plaintiff's October 16, 2000 visit, Dr. Zuhosky discussed with plaintiff the fact that he was going to release her without restrictions. He also discussed plaintiff's release with her case manager.
10. Plaintiff acknowledged at the hearing before the Deputy Commissioner that Dr. Zuhosky released her to work without restrictions in October of 2000. Plaintiff testified that she made the decision to quit her job after she had returned to full duty work. Plaintiff admitted that she has not made any effort to look for work since she quit her job.
11. During the course of his treatment, Dr. Zuhosky also referred plaintiff to Dr. Carlton of The Rehab Center to determine if she was a candidate for rehabilitation. Dr. Carlton saw plaintiff for one visit only, performing an independent medical examination on September 13, 2000. Prior to plaintiff's examination, Dr. Carlton reviewed the medical records from Dr. Zuhosky, the x-ray reports, the physical therapy reports, a report from Dr. Niemeyer and a report from Dr. Hutchinson. Dr. Carlton concluded plaintiff had received excellent care with a thorough diagnostic evaluation. Dr. Carlton's only suggestions were a trial of a sacroiliac belt and a TENS unit.
12. Dr. Carlton felt that plaintiff could continue with her light-duty job. Dr. Carlton believed that over time plaintiff would be able to return to her full regular duties. Dr. Carlton stated that if plaintiff's pain increased after September 2000, this would be uncharacteristic of plaintiff's initial injury and other causes for plaintiff's pain should be explored.
13. As of October 16, 2000, plaintiff had reached maximum medical improvement and she could work without restrictions.
14. Plaintiff received no medical treatment from October 16, 2000 until she saw Dr. Chris Covington with Rehabilitation Medicine Associates on October 18, 2001 for a consultation on her continued pain. Dr. Covington concluded that plaintiff's preexisting back symptoms were aggravated by the fall and diagnosed plaintiff with fibromyalgia. Dr. Covington was unable to causally relate plaintiff's fibromyalgia to the fall. He explained that this was based on the fact that he had no records or history of a global type myofascial discomfort. He further stated that he did not have an opinion as to when the symptoms started. He stated that he did not have any records to indicate whether or not the January 25, 2000 fall was a triggering event or if she had previous symptoms of fibromyalgia. Therefore, there is no competent medical evidence to support a causal relation between the January 25, 2000 accident and Dr. Covington's diagnosis of fibromyalgia.
15. Dr. Covington also diagnosed myofascial neck and low back pain and stated that the myofascial pain was a result of the accident which aggravated plaintiff's preexisting problems. However, the greater weight of the medical evidence shows that the compensable accident did not aggravate plaintiff's preexisting back problems. Dr. Covington stated that he could not give an opinion as to how much of plaintiff's pain was contributed to by fibromyalgia versus the back condition. Dr. Covington did note that if plaintiff had a preexisting fibromyalgia problem, then the regional complaints from the back and neck and the pain from the fibromyalgia would have fed each other as far as her pain complaints. However, he stated that he had no idea when the fibromyalgia started. Dr. Covington did not take plaintiff out of work and stated that he had no further treatment to offer her.
16. Dr. Covington testified that plaintiff reported to him a list of "perceived limitatations" that she was able to sit for only one hour at a time with frequent changes in positions, able to walk only 30-45 minutes, and had to lie down during the day at least three or four times daily for 30-60 minutes. Dr. Covington explained that these were self-reported limitations by plaintiff and not restrictions imposed by a physician. No physician, including Dr. Covington, has restricted plaintiff from work.
17. The Full Commission finds based upon the greater weight of the medical evidence, particularly the CT scan which did not show an acute injury at the L4-L5 level, and giving greater weight to the testimony of Drs. Zuhosky and Carlton, that the compensable injury by accident did not materially aggravate plaintiff's preexisting back condition and her spinal injury was limited to the injury to her coccyx or tailbone.
18. As the result of the compensable injury by accident, plaintiff sustained an ulnar neuropathy of her elbow.
19. Plaintiff's medical treatment as a result of her January 25, 2000 fall, in regards to her spine and elbow, was necessary to effect a cure, give relief and tended to lessen plaintiff's period of disability.
20. The Full Commission finds that there is insufficient medical evidence to show by the greater weight that any increase of plaintiff's back problems, migraine headaches, her depression or fibromyalgia were caused by her admittedly compensable injury by accident.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
Plaintiff sustained an admittedly compensable injury by accident on January 25, 2000 that resulted in an injury to her coccyx and an ulnar neuropathy of her elbow. N.C. Gen. Stat. § 97-2(6).
2. Defendants admitted compensability of plaintiff's injury by accident on January 25, 2000 by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v. Charmes/Arby's RoastBeef, 142 N.C. App. 154, 542 S.E.2d 277 (2001)
3. In order to meet the burden of proving disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). In the instant case no doctor took plaintiff out of work after her release to full-duty work without restrictions on October 16, 2000. Plaintiff voluntarily left work in October 2000 and made no effort thereafter to find employment. After being released to return to work, plaintiff sought no medical treatment for one year. Therefore, plaintiff has failed to establish by the greater weight of the medical evidence that as a result of the compensable injury by accident she is incapable of work in any employment after October 16, 2000. N.C. Gen. Stat. §§ 97-2(9); -29; Russell V. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
4. As the result of her compensable injury by accident, plaintiff retains a 3% permanent functional impairment to her back and is entitled to benefits at the rate of $409.22 per week for nine weeks. N.C. Gen. Stat. § 97-31(23).
5. Medical treatment of plaintiff's spine and the ulnar neuropathy to plaintiff's elbow was necessary to effect a cure, give relief and tended to lessen plaintiff's period of disability. Defendant is responsible for the payment of this treatment. Defendant is not responsible for payments for any medical treatment involving plaintiff's migraine headaches, her depression or her fibromyalgia. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff compensation for the permanent functional impairment to her back at the rate of $409.22 per week for nine weeks. This amount shall be paid to plaintiff in a lump sum subject to an attorney fee provided below.
2. Defendant shall pay for all medical treatment incurred or to be incurred as a result of plaintiff's January 25, 2000 injury by accident, which involved plaintiff's coccyx and elbow, for so long as such treatment tends to effect a cure, give relief or tends to lessen plaintiff's period of disability.
3. An attorney fee of 25% of the benefits awarded to plaintiff in paragraph one of this award is approved for plaintiff's counsel. Defendant shall deduct this amount and send it directly to plaintiff's counsel.
4. Defendant shall pay the costs.
This the ___ day of June 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER